PROSKAUER ROSE LLP
Sally L. Schneider
1585 Broadway
New York, New York  10036
(212) 969-3803

sschneider@proskauer.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TRUSTEES of the MASON TENDERS             :
DISTRICT COUNCIL WELFARE FUND,            :
PENSION FUND, ANNUITY FUND and            :          08 Civ. 4333 (VM)
TRAINING PROGRAM FUND,                    :
                                          :
                         Plaintiffs,      :    **AFFIDAVIT OF DAVID**
                                          :    **BOLGER IN SUPPORT OF**
            - against -                   :    **PLAINTIFFS' MOTION FOR**
                                          :    **JUDGMENT BY DEFAULT**
FIRST CHOICE CONSTRUCTION SERVICES, INC., :    **AGAINST DEFENDANT**
                                          :
                         Defendant.       :
------------------------------------------------------------------X

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )


          David Bolger, being duly sworn, states:

          1.      I am one of two field representatives of the Mason Tenders District
Council of Greater New York (the "Union").

          2.      The Union is a labor organization within the meaning of Section 301 of
the Taft-Hartley Act (29 U.S.C. § 185) that represents employees in the building and
construction industry, an industry that affects commerce.

          3.      The Union is the representative of its constituent locals, and each local is a
labor organization operating as a labor union with more than seven (7) members within the City,
County and State of New York.

4.     Robert Bonanza is the current Business Manager of the Union.  Anthony Silveri was the Business Manager of the Union from December 10, 1997 to September 30, 2004, and I am personally familiar with his handwriting and signature.

5.     My responsibilities include, among other things, the maintenance of the collective bargaining agreements executed by individual employers and by employer associations with the Union, and of notices of modification, amendment or termination of collective bargaining agreements sent by parties to the agreements, and endeavoring to have signatory and bound employers comply with the terms of the collective bargaining agreements.

6.     The Environmental Contractors Association (the "ECA") is one of the employer associations that act as a bargaining agent for its member-employers for the purpose of collective bargaining with the Union.

7.     First Choice Construction Services, Inc. ("First Choice") was a member of the ECA and bound by the collective bargaining agreement between the Union and the ECA covering the period December 1, 2003 through November 30, 2007 (the "Agreement").  Anthony Silveri signed the Agreement on behalf of the Union.

8.     The Agreement is maintained by the Union in the ordinary course of its business.  A true copy of the ECA's letter notifying the Union of First Choice's membership and the Agreement are attached as Exhibit A.

9.     I am familiar with the terms and conditions of the Agreement.  I am also familiar with defendant First Choice.

10.     The mason tender employees of First Choice performed asbestos removal and abatement work in the five boroughs of New York City.  This type of work and the location is within the jurisdiction of the Union that is covered by the Agreement.

11.     Article VIII of the Agreement requires First Choice to pay fringe benefit contributions, dues checkoffs and PAC contributions and submit contribution reports to the plaintiffs Mason Tenders District Council Funds (the "Funds") for all hours worked by defendant's mason tender employees.

12.     Article VIII of the Agreement requires First Choice to pay the required fringe benefit contributions, dues checkoffs and PAC contributions on or before the fifteenth (15th) day of each month for the work performed during the preceding calendar month.

13. The Mason Tenders District Council Welfare Fund collects the required dues checkoffs and PAC contributions from employers on behalf of the Union, as its authorized agent.

14. Article VIII of the Agreement requires First Choice to permit and cooperate in the conduct of audits of its books and records for purposes of determining if all contractually required fringe benefit contributions, dues checkoffs and PAC contributions have been paid.

15. Article VIII of the Agreement also requires First Choice to pay either the imputed costs of the audits or the actual costs, whichever is less, if it is "substantially delinquent", and "substantially delinquent" is defined as any delinquency in the payment of fringe benefit contributions to the Funds in excess of 10% of the fringe benefit contributions paid to the Funds during the period covered by the audit.

David Bolger

Sworn to before me this
_5_ day of ~~July,~~ 2008
Aug.

Notary Public

TONI-LYN RICCARDI
Notary Public - State of New York
NO. 01RI6138684
Qualified in Suffolk County
My Commission Expires 12/27/09

3

# Environmental Contractors Association

c/o of Building Trades Employers Association 1430 Broadway – 8th Floor, New York, New York 10018
Tel. (212) 704-9745 Fax (212) 704-4367



May 21, 2004

RECEIVED
MAY 2 5 2004
By_____

David Bolger
Mason Tenders District Council
520 8th Avenue
#650
New York, NY 10018

Re:     ECA Membership

Dear Mr. Bolger:

Please be advised that the following contractor is a member of the Environmental
Contractors Association effective June 7, 2004:

**Francisco Fantini, President**
**First Choice Construction Services, Inc.**
**38-11 31st Street**
**Long Island City, NY 11101**
Tel: 718-784-4488
Fax: 718-786-5903

As a member of the ECA, this firm is signatory to the collective bargaining agreement
and bound to the provisions stated therein.

If you have any questions please contact me at 212-704-9745.

Sincerely,

Louis J. Coletti
Administrator

LJC:vg

# TRADE AGREEMENT

Between the

## MASON TENDERS'

## DISTRICT COUNCIL

## OF GREATER NEW YORK

and

## LOCAL 12A ABATEMENT

## OF THE INTERNATIONAL ASSOCIATION

## OF HEAT AND FROST INSULATORS

## AND ASBESTOS WORKERS

and the

## ENVIRONMENTAL CONTRACTORS ASSOCIATION, INC.

Effective on and after December 1, 2003

To November 30, 2007

2003 – 2007

ARTICLE I.        SCOPE OF AGREEMENT . . . . . . . . . . . . . . .        1

ARTICLE II.       OTHER CONTRACTS . . . . . . . . . . . . . . . .        1

ARTICLE III.      UNION SECURITY AND HIRING ARRANGEMENTS        3

ARTICLE IV.       JURISDICTION . . . . . . . . . . . . . . . . . . .        6

ARTICLE V.        MANAGEMENT'S RIGHTS . . . . . . . . . . . . . .        7

ARTICLE VI.       HOURS AND OVERTIME . . . . . . . . . . . . . .        8

ARTICLE VII.      WAGES AND CLASSIFICATIONS . . . . . . . . . .        9

ARTICLE VIII.     FRINGE BENEFITS AND DUES . . . . . . . . . . .        11

ARTICLE IX.       WORKING CONDITIONS . . . . . . . . . . . . . .        18

ARTICLE X.        SHOP STEWARDS AND FOREMEN . . . . . . . . . .        19

ARTICLE XI.       STRIKES AND LOCKOUTS . . . . . . . . . . . . . .        21

ARTICLE XII.      DISPUTES AND GRIEVANCES . . . . . . . . . . . .        23

ARTICLE XIII.     NON-DISCRIMINATION . . . . . . . . . . . . . . .        25

ARTICLE XIV.      MISCELLANEOUS . . . . . . . . . . . . . . . . . .        26

ARTICLE XV.       PERIOD OF AGREEMENT . . . . . . . . . . . . . .        28

A:\nydocs1-_119293-v4-ECA_Local_78_Agreement_2003-2007_(twr_1).doc

# TRADE AGREEMENT

This Trade Agreement (hereinafter designated as the "Agreement") is entered into by and between the ENVIRONMENTAL CONTRACTORS ASSOCIATION, INC. (hereinafter the "Association") and the MASON TENDERS' DISTRICT COUNCIL OF GREATER NEW YORK, affiliated with the Laborers' International Union of North America, for its constituent Local Union 78 ("Mason Tenders") and Local 12A Abatement of the International Association of Heat and Frost Insulators and Asbestos Workers ("Asbestos Workers") (hereinafter collectively the "Unions.").

## ARTICLE I.                    SCOPE OF AGREEMENT

### Section 1.

The Unions claim and have shown, and the Association and any and all Employers acknowledge and agree, that a majority of employees have authorized the Unions to represent them in collective bargaining. The Association and Employers hereby recognize the Unions (in regard to their respective jurisdictions as defined below) as the exclusive bargaining representative under Section 9(a) of the National Labor Relations Act for all employees who perform work covered by Article IV of this Agreement on all present and future job sites.

### Section 2.

This Agreement shall apply and is limited to all asbestos and lead abatement work as defined in ARTICLE IV – JURISDICTION and performed in the five boroughs of New York City and Nassau and Suffolk Counties on Long Island.

## ARTICLE II.                    OTHER CONTRACTS

### Section 1.

(a)    If, within the jurisdiction of this Agreement, any Union enters into any agreement with any employer or association that provides, contains or otherwise permits more favorable terms or conditions of employment to such employer or association in the performance of bargaining unit work than are provided for in this Agreement, then each member of the Association (hereinafter "Employer") shall have the option to assume such more favorable terms or conditions and apply them to employees represented by the Union that entered into such more favorable agreement, provided all aspects of the agreement directly related to such more favorable terms and conditions are assumed.

(b)    If, within the jurisdiction of this Agreement, any Union allows any practice by any employer or association that provides or permits more favorable terms or conditions of employment to such employer or association in the performance of bargaining unit work than are provided for in this Agreement, and the Union fails to file a grievance or take other appropriate action to bring about a complete cessation of such practice within ten (10) calendar days of its receipt of written notice thereof from the Association, then such more favorable terms and conditions shall be available to the members of the Association to apply to employees represented by the Union that permitted the more favorable terms.

(c)    The preceding paragraphs (a) and (b) of this Section shall have no application to terms and conditions of employment provided in, or maintained under, collective bargaining agreements negotiated by the Building Contractors Association, the Contractors Association of Greater New York, the Cement League, the Association of Brick Mason Contractors, or their successors.

## Section 2

Each Employer agrees that it will not subcontract "on site" bargaining unit work as defined in Article IV unless the Employer receiving the subcontract agrees to be bound by the terms of this Agreement and/or has an Agreement with the Union having jurisdiction over such work under Article IV of this Agreement.  When an Employer subcontracts any such work, the Employer shall be responsible for the subcontractor complying with all provisions of the Agreement.   Any Employer who subcontracts any such work shall be responsible for the payment of wages, fringe benefits fund contributions, and working dues check-offs by such subcontractor.  The Employer and the Unions hereby agree to the elimination of lumping.

## Section 3

Employers may subcontract non-bargaining unit work as defined in Article IV and shall have no responsibility for obligations of such subcontractors.

## Section 4

This Agreement shall be binding on the signatory parties hereto and shall apply to the parents, affiliates, subsidiaries, or other ventures of any such party.

## Section 5

If any Employer covered by this Agreement or any of the Employer's owners forms or acquires by purchase, merger or otherwise, an ownership interest in another company performing bargaining unit work within the jurisdiction of this Agreement, this Agreement shall cover such other company, and the employees of such other company performing bargaining unit work shall be considered an accretion to the bargaining unit within the jurisdiction of this Agreement.

## Section 6

If an Employer covered by this Agreement or any of the Employer's owners forms or acquires by purchase, merger or otherwise, an ownership interest in another company performing bargaining unit work within the jurisdiction of this Agreement, this Agreement shall cover such other company, and the Employer and such other company shall be jointly and severally liable for each other's obligations under this Agreement.

- 2 -

**Section 7**

Except as provided by law, any natural person who is an owner, principal, officer, director, employee or agent of any Employer and/or the Association shall have no personal liability of any kind whatsoever under this Agreement.

**ARTICLE III.        UNION SECURITY AND HIRING ARRANGEMENTS**

**Section 1:**

If shall be a condition of employment that all employees of the Employer who perform work covered by Article IV of this Agreement shall become or remain members in good standing of the applicable Union or shall pay uniform initiation and agency fees on or after the eighth (8th) day following the execution of this Agreement, or after the eighth (8th) day following the beginning of covered employment. Each Union agrees that all employees will be accepted to membership or placed on its out-of-work list on the same terms and conditions generally applicable to other members or laborers on its out-of-work list and further, that the Employer will not be requested to discharge an employee for reasons other than such employee's failure to tender the periodic dues or fees uniformly required.

**Section 2**

The Employers shall have the right to determine the qualifications and competency of all employees and the number and type of employees required, and to reject any job applicant referred to the Employer by a Hiring Hall under Section 3, below; provided that the Employer's rejection of a Shop Steward must be based on the Shop Steward's qualifications or competency. The rejection of a Shop Steward may be grieved in accordance with the provisions of Article XII (Disputes and Grievances). If the Shop Steward is found to have been improperly rejected, he shall be paid for all lost time at the rate of 40 hours per week and shall be reinstated.

**Section 3**

(a)    Whenever an Employer requires employees to perform work covered by this Agreement on any job, the Employer shall notify the appropriate Hiring Hall, either by telephone or in writing (on a form to be supplied by the Union to all signatory Employers), stating the job location and the job start date and start time, and the number and type of employees required. For work performed in the five (5) boroughs of New York City and Nassau and Suffolk Counties on Long Island, the Mason Tenders and Asbestos Workers will operate the Hiring Halls.

(b)    Each Union shall maintain one out-of-work registration list ("out-of-work list") of all qualified applicants, as defined in subparagraph c, below, who are out of work, in the order in which such individuals register with the Union. This out-of-work list shall be maintained by the Unions at the Hiring Halls. One or more representatives of each Hiring Hall shall be on call 24 hours per day, 365 days per year, for the purpose of receiving and processing Employer referral requests.

(c).    An applicant shall be qualified, and thus eligible for employment, only if that applicant: (i) has not been previously rejected and deemed unsatisfactory for work in writing by the Employer who submitted the request for employees; (ii) has documentation of a current physical examination, which exam and documentation shall be provided at the Union's expense; (iii) has produced all current licenses or certificates required to perform the work that is the

- 3 -

subject of the Employer's request to the Union and, in that regard, the Union agrees to cooperate in a program to verify the licenses or certificates required to perform work under this Agreement; and (iv) has the appropriate paperwork demonstrating a current fit test, if necessary for the work that is the subject of the Employer's request.

(d)     The Unions shall remove from the out-of-work lists any individual who has been the subject of rejection letters from three or more Employers in any rolling three-year period. An applicant may grieve, commencing with Step 3 pursuant to Article XII, whether such letters are valid for purposes of this subparagraph d; provided that an Employer's decision to reject an applicant based on subparagraph c(i) of this Section 3 or otherwise pursuant to Section 2 of this Article III may not be made the subject of a grievance, except as provided in Section 2 with regard to the qualifications or competency of a Shop Steward, and, further provided that the sole issue to be determined in such grievance shall be whether the individual can establish that one or more of the rejection letters was received for a reason other than said individual's qualifications or competency to perform the work for which said individual was referred; and further provided that if any individual prevails in such a grievance, said individual shall not be referred for employment to any Employer who has previously rejected said individual for employment in writing, including any Employer whose rejection letter was the subject of the grievance.

(e)     The Hiring Halls shall fill Employer referral requests and dispatch to the Employers qualified applicants in order of their registration on the out-of-work list. Each applicant referred to an Employer shall be given a written dispatch slip by the Hiring Hall confirming his dispatch to the Employer and indicating the request the dispatched applicant is filing.

(f)     Except as provided below, at the request of an Employer or his agent, the Hiring Halls shall refer to the Employer any individual requested by name who is on that Union's A List or any individual who has previously worked for the Employer and is requested by name and is on that Union's out-of-work list and shall provide such individual with a dispatch slip without regard to where such individuals are placed on the out of work list or whether they on the out-of work-list. The preceding notwithstanding:

i. on any job on which the Mason Tenders provide 80% of the Handlers for the Project as required in Article IV, the eleventh Handler on the job, and every fifth Handler thereafter shall be referred from the Local 78 out of work list pursuant to Hiring Hall Rules established by Local 78, and may not be called by name by an Employer or its agent. Further, on any job on which the Mason Tenders provide 80% of the Handlers, the 14th Handler on the job, and every fifth Handler thereafter shall be an apprentice participating in the JATC administered program referred to on Article XIV, Section 10 (at the option of the Employer, the fifth Handler on any such job may also be an apprentice participating in such JATC administered program). An illustration of such ratio is attached as Schedule B(1) hereto.

ii.     on any job on which Local 12A provides 80% of the Handlers for the Project as required in Article IV, the eleventh Handler on the job, and every fifth Handler thereafter shall be referred by Local 12A. Further, on any job on which Local 12A provides 80% of the Handlers, the 14th Handler on the job, and, if Local 12A maintains a registered apprenticeship program, every fifth Handler thereafter shall be an apprentice participating in the Local 12A apprenticeship program (at the option of the Employer, the fifth Handler on any such job may also be an apprentice participating in such program). An illustration of such ratio is attached as Schedule B(2) hereto.

- 4 -

Upon request, the Hiring Halls shall provide the Association or individual Employers with copies of all out-of-work lists, at the reasonable cost set forth in the Local's Hiring Hall Rules.

(g)    The Hiring Halls shall not knowingly refer or dispatch any employee then currently employed by any other Employer working under this Agreement.

(h)    In the event that a Hiring Hall is unable to fill any request for employees within forty-eight (48) hours after the request is made by the Employer, the Employer may employ individuals from any other available source. The Employer shall inform the appropriate Union of the name and social security number of any individuals hired from other sources and shall refer the individuals to the Hiring Hall for dispatch to the Employer. In the event a Union is unable to fill any request for Handlers on a timely basis and such request is filled by the alternative Union, the Handlers provided by the alternative Union shall stay on that job until discharged by the Employer. All future hiring on that job shall be divided by the original 80% - 20% ratio and no hirings or terminations shall be required to rebalance the ratio for the duration of the job.

(i)    The parties to this Agreement shall post in places where notices to employees or applicants for employment are customarily posted, all provisions relating to the function of the hiring arrangements, including the safeguards that are essential to the legality of such an exclusive hiring arrangement.

(j)    The Unions shall have the right to collect a reasonable fee for inclusion on the out-of-work list from all persons who are not members in good standing of the Union or are not tendering uniform initiation and agency fees uniformly required. Said fee shall be collected to cover the reasonable cost of maintaining the out-of-work list. At the earliest date permitted by law a person who has paid said fee to be included on the out-of-work list and is referred to an Employer shall tender to the Union upon acceptance for employment by the Employer the uniform initiation and agency fees uniformly required.

(k)    The Employer agrees to discharge, upon receiving seven (7) days' written notice, signed by the Secretary-Treasurer of the Union, any employee with respect to whom such notice may state that such employee has failed to tender uniform initiation and agency fees uniformly required, provided that said written notice is also provided to said employee and that said employee has not paid the required initiation and agency fees within seven (7) days of the date of the written notice. The Union shall indemnify, defend, and hold the Employer harmless against any damage, loss, backpay award, expenses (including attorneys' fees) or financial liability arising from the Employer's compliance with such notice.

### Section 4

(a)    Any Handler referred or dispatched to an Employer shall not be entitled to commence work, or receive reporting pay, or any other wages, benefits or other entitlement under this Agreement, unless such Handler is qualified and brings with him at the time the Handler reports to work copies of the following documents, which shall be given to the Employer at the time the Handler reports to work: (A) all current licenses or certificates required to perform the work to which the Handler has been referred together with documentation of the history of such license and any pertinent training certificates; and (B) documentation of a current physical examination. The Handler is also expected to have with him, but its absence shall not

be a basis for barring the Handler from commencing work, the dispatch slip from the Hiring Hall for the job for which the Handler is reporting.

(b)     Each Hiring Hall shall maintain in its files, for each individual registered on its out-of-work list, copies of each document described in subparagraph (a) of this Section 4. Upon request by an Employer, the Hiring Hall shall provide additional copies of these documents by facsimile or otherwise for any employee whom the Hiring Hall has referred to the Employer, and who has personally picked up his dispatch slip from the Hiring Hall. The cost of providing these documents to an Employer will be paid to the Union either by the employee, if the request for these documents is due to the fault of the employee (e.g., the employee's failure to bring such documents as required by sub-paragraph (a) of this Section 4), or by the Employer, if the request is due to the fault of the Employer (e.g., the Employer lost the documents provided by the employee) according to the following schedule: $2.00 per employee if sent by mail, or $3.00 per employee if sent by fax.

(c)     An Employer may reject any referral for any reason, except for the Shop Steward, who may be rejected under the terms of Article III, Section 2 only; provided the Employer complies with Article VI, Section 5 (Reporting Pay); provided further that said Article VI, Section 5 shall not apply to employees who are rejected pursuant to subparagraph (a) of this Section 4.

### Section 5

(a)     The job referral system set forth in this Article will be operated in a non-discriminatory manner and in full compliance with Federal, State, and local laws and regulations which require equal employment opportunities and non-discrimination, and shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspects of obligations of union membership, policies or requirements. All of the foregoing hiring procedures, including related practices affecting apprenticeship and training, will be operated so as to facilitate the ability of the Employers to meet any and all equal employment opportunity/affirmative action obligations.

(b)     The Employers and the Unions agree there will be no discrimination in any manner prohibited by law against any employee or applicant for employment, with respect to race, color, religion, sex, national origin, age, marital status, physical or mental disability, veteran status, genetic predisposition or carrier status, alienage or citizenship status, or sexual orientation, in all employment decisions, including but not limited to recruitment, referral, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, layoff and termination, and all other terms and conditions of employment.

(c)     In the event that an Employer or any individual employee claims that he/she is being discriminated against in hiring because of Union or non-Union status, or by reason of any provision contained in this Section, he/she shall file a complaint with the Employer and/or Union setting forth the details of such alleged discrimination and the matter shall be referred for resolution and processed in accordance with Article XII below (Disputes and Grievances).

(d)     Employers have the right to refer employees to the Hiring Hall to be added to the out-of-work list.

## ARTICLE IV.                    JURISDICTION

### Section 1

The parties recognize the exclusive jurisdiction of the Unions over the removal, abatement, encapsulation or decontamination of asbestos, lead or other toxic or hazardous waste or materials which work shall include, but not be limited to: the erection, moving, servicing, operation, and dismantling of all enclosures, scaffolding, barricades, decons, negative air machines, vacuum trucks, blasting and scraping equipment, chemicals and chemical applying equipment, and any other tools, equipment or materials used in the removal, abatement, encapsulation or decontamination of asbestos, lead or other toxic or hazardous waste or materials, as well as the servicing and operation of tools and performance of all work related to the sorting, labeling, bagging, cartoning, crating, packaging and movement of such asbestos, lead or other toxic or hazardous waste or materials for disposal; the movement and/or transportation and disposal of such asbestos, lead or other toxic or hazardous waste or materials to any authorized disposal site; the clean up of the work site and all other work and stand-by time incidental to the removal, abatement, encapsulation or decontamination of such asbestos, lead or other toxic or hazardous waste or materials; and the performance of safety watch duties.

### Section 2

(a)     Where work described in Section 1 above is performed within the five (5) boroughs of New York City, or Nassau or Suffolk County on Long Island, jurisdiction over such work shall be divided as follows: on all jobs the Mason Tenders shall provide 80% of the Handlers and the Asbestos Workers shall provide 20% of the Handlers; provided that on industrial or Con Edison projects that solely involve the removal of insulation materials from mechanical systems (*e.g.*, pipes, boilers, ducts, flues and/or breechings) that are not going to be scrapped, the Mason Tenders shall provide 20% of the Handlers for the project and the Asbestos Workers shall provide 80% of the Handlers for the project as long as the applicable union is able to refer sufficient numbers of qualified Handlers on a timely basis.

(b)     Whenever used in this Article, or elsewhere in the Agreement, the 80%-20% ratio for the provision of Handlers on a job site where the Mason Tenders provide 80% of the Handlers shall be observed as specified in Schedule B(1). The 80%-20% ratio for the provision of Handlers on a job site where the Asbestos Workers provide 80% of the Handlers shall be observed as specified in Schedule B(2).

(c)     Employers shall have the right, but not the obligation, to hire an Employer-selected apprentice instead of a journeyperson as the 5th Handler.

## ARTICLE V.                    MANAGEMENT'S RIGHTS

### Section 1

Except as expressly limited by other provisions of this Agreement, each Employer retains the sole right: to manage the affairs of its business and to direct its workforce; to promote, transfer, or layoff, or to discipline or discharge for cause; to promulgate reasonable work rules not inconsistent with this Agreement; to select foremen; to assign and schedule work; to increase or decrease the work force and to lay off employees due to lack of work and other legitimate reasons, and to select employees to be laid off, provided that the Shop Steward will be the second to last employee laid off; to assign and change the work, duties and job functions of

specific employees, provided that the Employer does not interfere with the ability of Shop Stewards to carry out their proper functions as Shop Stewards; to determine the qualifications and competency of employees; to determine the number of hours to be worked; to discontinue or close down, temporarily or permanently, in whole or in part, the operations of its business or to sell part or all of such business or operations; to determine the number of employees assigned to any particular job or task; and to carry out the ordinary and customary functions of management.

### Section 2.

There shall be no limitation or restriction by the Unions upon the Employer's choice of materials or design, nor, regardless of source or location, upon the selection or use of equipment, machinery, packaging, materials, tools, or devices.

### Section 3.

The use of technology, equipment, machinery, tools and/or labor saving devices and methods of performing work may be initiated by the Employer from time-to-time during the term of this Agreement. If there is any disagreement between an Employer and a Union concerning the use or implementation of any such device or method of work, the implementation shall proceed as directed by the Employer, and the Union shall have the right to grieve and/or arbitrate the dispute as set forth in Article XII (Disputes and Grievances) of this Agreement, except that the Employer shall not implement any disputed changes affecting the employees' hygiene, health or safety prior to a final determination by the Joint Arbitration Board or Arbitrator pursuant to Article XII.

### ARTICLE VI.                    HOURS AND OVERTIME

### Section 1.

(a)    Each Employer shall have the right to schedule shifts, days and hours of work and daily starting and quitting times for employees. Employees shall receive a one-half (1/2) hour unpaid meal period, approximately at the mid-point of their shifts. Employees working a shift of more than 12 hours shall receive an additional one-half (1/2) hour unpaid meal period, approximately at the mid-point of the second half of their shifts.

(b)    In the Employer's discretion, lunch periods may be staggered to allow employees time to clean up.

### Section 2.

The work week will start on Monday and conclude on Sunday.

### Section 3.

There shall be no shift differential pay.

### Section 4.

(a)    Overtime shall be defined as all hours worked in excess of eight hours per day or forty (40) hours per week. Overtime shall be paid at the rate of one and one-half times the employee's regular straight-time rate of pay.

- 8 -

(b)     There will be no restriction on the Employer's scheduling of overtime. Overtime shall be offered to employees then currently performing the work schedule for overtime on the job site. The employees may reject such offers of overtime without being subject to discipline, provided that the Employer has a sufficient number of employees who accept the offer of overtime work. The Employer can require employees to work overtime in the event of an emergency, or in the event an insufficient number of employees volunteer for overtime work; and the Employer can require specific employees to work overtime to complete a specific task on which they are working; provided that no employee can be required to work more than 14 hours per day.

(c)     No overtime rate or premium pay of any kind under this Agreement shall be pyramided, compounded, added together or paid twice for the same time period.

## Section 5

(a)     If an Employer requests employees to report on any day and such employees report for work on that day at the designated starting time with the requisite respirator and paperwork, as described in Article III, Section 4 (Hiring Hall), but are not put to work, then such employees shall be entitled to two (2) hours' reporting pay at their regular straight time rate of pay, except in circumstances beyond the Employer's control, or unless the employee had been informed not to report, had failed to comply with subparagraph (d) below of this Section 5, or was sent home for misconduct.

(b)     If the Employer requests employees to report on any day, and such employees report for work on that day at the designated starting time with the requisite respirator and paperwork, as described in Article III, Section 4 (Hiring Hall), and are put to work, but work fewer than four (4) hours, then such employees shall be entitled to four hours' reporting pay at their regular straight time rate of pay, except in circumstances beyond the Employer's control, or unless the employee was sent home for misconduct.

(c)     Whenever reporting pay is provided for employees, they will be required to remain at the work site available for work for such time as they receive such pay, unless released earlier by the principal supervisor of the Employer at the work site or his designated representative.

(d)     Each employee shall furnish his Employer with his current address and telephone number, and shall promptly report any changes in each to the Employer.

## Section 6

Except as provided in Section 5 above, it is understood and agreed that neither the provisions of this Article nor any other provisions of this Agreement are to be considered a guarantee of the availability in a workweek of any particular number of days or hours of work or pay for any employee.

## Section 7.

All work performed between 12:00 AM and 11:59 PM on the following holidays shall be paid at the rate of time and one-half the Handler's regular straight-time rate of pay.

New Year's Day

Easter

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas

(The date New York City observes any of the above referenced holidays shall be the contract Holiday in the event it is different from the date on which the Holiday actually falls).

**ARTICLE VII.**                     **WAGES AND CLASSIFICATIONS**

### Section 1

(a)     All work covered by this Agreement shall be performed by Handlers.

(b)     Pursuant to the Mandatory Apprentice Program adopted by Local 78, all Handlers represented by the Mason Tenders on any job shall either be credited as Journeymen by the Joint Apprenticeship Training Committee referred to on Article XIV, Section 10. ("JATC"), or designated and enrolled as Apprentices in the JATC administered program.

(c)     All Handlers provided by the Asbestos Workers shall be either Class A or Class B journeypersons or apprentices enrolled in a program administered by the Joint Apprenticeship Training Committee referred to on Article XIV, Section 10.  Class A journeypersons are those journeypersons who become members of the Asbestos Workers prior to January 1, 2004.  Class B journeypersons are those who become members of the Union on or after January 1, 2004. Class B journeypersons shall become Class A journeypersons after performing 750 hours of Handler work.  The responsibility for identifying journeypersons as belonging to Class A or Class B shall rest with the Asbestos Workers.

### Section 2

(a)     Wage rates for Handlers shall be in accordance with Schedule A annexed to this Agreement.

(b)     The wage rate for Foremen shall be $2.00 per hour above the prescribed rate for Handlers.

(c)     Nothing contained in this Agreement shall be construed so as to limit in any way the right of the Employers to grant discretionary merit increases in the hourly wage rates paid employees covered by this Agreement, provided that the Employer will advise the Union of the name of each employee who is receiving such an increase and the amount of such increase, and provided further that such increases will not be revoked prior to completion of the applicable phase of the project.  No Employer shall pay a bonus to any employee covered by this Agreement unless said bonus is paid by check and the Employer has obtained prior consent of the Union, which consent will not be unreasonably withheld.

(d)     The Unions, in their sole and absolute discretion, reserve the right to allocate or reallocate any wage rates or fringe benefit contribution rates set forth in Schedule A, as long as uniformly applied under this Agreement.

### Section 3

The Employer, its employees or the agents of either shall not accept or give directly or indirectly, any rebate on wages, or give or accept gratuities, or give anything of value or extend any favor to any person for the purpose of affecting any change in rate of wages. The Employer or its representatives shall not be permitted to give any advance in wages or lend money to its employees covered by this Agreement unless said advance or loan is made by check and written notice thereof is given to the Union.

### Section 4

(a)     All employees covered by this Agreement may be paid by check and shall be paid no later than the end of the work shift on Thursday.

(b)     Any employee who is discharged or laid off shall be paid on the regularly scheduled payday for that week. Notification of layoff shall be at the Employer's discretion, but given not later than the end of the work shift on the date the layoff is to be effective. Such notification may be oral.

(c)     In the event that any paycheck issued by an Employer is not honored, said Employer shall be required to pay all of its employees with certified checks.

### ARTICLE VIII.               FRINGE BENEFITS AND DUES

### Section 1

(a)     For work performed by members of the Mason Tenders' District Council of Greater New York, Employers shall pay Fringe Benefits Fund contributions to the applicable Mason Tenders' District Council of Greater New York Trust Fund ("MTDC Funds").

(b)     For work performed by members of the Asbestos Workers, Employers shall pay Fringe Benefits Fund contributions to the applicable Asbestos Workers Fringe Benefit Funds ("Local 12A Funds").

(c)     No Employer shall be obligated under any circumstance to pay fringe benefit contributions to the Trust Funds of more than one of the Unions that are signatory to this Agreement for the same hours worked by a Handler.

### Section 2

The Employer shall deduct the sums per hour set forth in Schedule A as designated by the Union referring the Handler, or such other amount as may be later designated by the referring Union, as dues from the wages of all employees covered by this Agreement who authorize such deduction in writing; it shall then promptly pay over such sums to the Union or its designated agent for collection not later than the fifteenth (15th) day of the month following the month in which said deduction was made.

**Section 3**.

(a)      Effective for the period December 1, 2003 to November 30, 2007, and subject to the Union's right to allocate/reallocate future increases as provided in Article VII, the Employer shall pay monthly to the Trustees of the applicable Welfare Fund the hourly rate specified in Schedule A for all hours worked by the employees covered by this Agreement.

(b)      Contributions to the Welfare Funds shall be for the purpose of providing benefits for death, accident, health, medical and surgical care, hospitalization and other such forms of group benefits for employees covered by this Agreement, their spouses, and their eligible children, as the Trustees may, in their sole and absolute discretion, determine and, in addition, out of said monies the Trustees of the Welfare Funds shall provide coverage to conform with the New York State Disability Insurance Law for all employees covered by this Agreement for the period of this Agreement, the cost of which shall be borne by such Welfare Fund.  It is the intention of the parties that no contributions shall be required on the premium portion of wages, i.e. contributions shall be based upon hours worked and not upon wages paid.

(c)      Welfare coverage shall also be provided for all eligible employees of the Unions and the Fringe Benefit Funds, provided contributions are made to the Funds by their employers on their behalves in amounts no less than are paid by Employers covered by this Agreement.

**Section 4**.

(a)      Effective for the period December 1, 2003 to November 30, 2007, and subject to the Union's right to allocate/reallocate future increases as provided in Article VII, the Employer shall pay monthly to the Trustees of the applicable Pension Fund the hourly rate specified in Schedule A for all hours worked by employees covered by this Agreement.

(b)      Contributions to the Pension Funds shall be utilized for the purpose of providing pension and other benefits for the eligible employees covered by this Agreement as the Trustees may, in their sole and absolute discretion, determine.  It is the intention of the parties that no contributions shall be required on the premium portion of wages, i.e., contributions shall be based upon hours worked and not upon wages paid.

(c)      Pension coverage shall also be provided for all eligible employees of the Union and the Fringe Benefit Funds provided contributions are made to the Funds by their employers on their behalves in amounts no less than are paid by Employers covered by this Agreement.

**Section 5**

(a)      Effective for the period December 1, 2003 to November 30, 2007, and subject to the Unions' right to allocate/reallocate future increases as provided in Article VII, the Employer shall pay monthly to the Trustees of the applicable Annuity Fund the hourly rate specified in Schedule A for all hours worked by employees covered by this Agreement.

(b)      Contributions to the Annuity Funds shall be utilized for the purpose of providing annuity and other benefits to eligible employees covered by this Agreement as the Trustees may, in their sole and absolute discretion, determine.  It is the intention of the parties that no contributions shall be required on the premium portion of wages, i.e., contributions shall be based upon hours worked and not upon wages paid.

(c)    Annuity Fund coverage shall also be provided for all eligible employees of the Unions and the Fringe Benefit Funds, provided contributions are made to the Fund by their employers on their behalves in amounts no less than are paid by Employers covered by this Agreement.

**Section 6**

(a)    Effective for the period December 1, 2003 to November 30, 2007, and subject to the Union's right to allocate/reallocate future increases as provided in Article VII, the Employer shall pay monthly to the Trustees of the applicable Training Fund the hourly rate specified in Schedule A for all hours worked by employees covered by this Agreement. Contributions to the Training Funds shall be used for the purpose of providing education and training in the handling of asbestos, lead, toxic and hazardous waste and materials. It is the intention of the parties that no contributions shall be required on the premium portion of wages, i.e., contributions shall be based upon hours worked and not upon wages paid. ·

(b)    Contributions to the Mason Tenders' Training Fund shall also be used for the purpose of paying for the lead blood tests that OSHA requires the Employers covered by this Agreement to make available to employees. Notwithstanding the foregoing, it is understood and agreed that the Mason Tenders' Training Fund (including its Board of Trustees, other fiduciaries and employees) shall have no responsibility or liability relating in any way to, or arising out of, the lead blood tests, including any responsibility to ensure that the tests are performed (and the results are acted upon) in a manner that is consistent with OSHA's requirements, other than to pay for such tests in accordance with terms established by the Board of Trustees. Moreover, the Board of Trustees retains the right to modify at any time the benefits provided under the Mason Tenders' Training Fund, which includes the right to adopt a resolution to cease paying for the lead blood tests, as herein provided.

(c).    Contributions to the Mason Tenders' Training Fund shall also be used for the purpose of reimbursing employees in the amount of $84 for the annual respiratory exams that OSHA requires the Employers covered by this Agreement to make available to employees. Notwithstanding the foregoing, it is understood and agreed that the Mason Tenders' Training Fund (including its Board of Trustees, other fiduciaries and employees) shall have no responsibility or liability relating any way to, or arising out of, the respiratory exams, including any responsibility to ensure that the tests are performed (and the results are acted upon) in a manner that is consistent with OSHA's requirements, other than to reimburse employees for such exams in accordance with terms established by the Board of Trustees. Moreover, the Board of Trustees retains the right to modify at any time the benefits provided under the Mason Tenders' Training Fund, which includes the right to adopt a resolution to cease reimbursing the members for the respiratory exams as herein provided.

(d)    It is specifically understood and acknowledged that the obligation to make the above tests available is solely the obligation of the Employers who are required by OSHA to make these tests available and, by providing these benefits through the Mason Tenders' Training Fund, the Fund (including its Board of Trustees, Directors and employees) is not assuming any obligation or liability of the Employers under any applicable law, including (without limitation) OSHA or any similar state or local law, and is not acting as the Employer's agent.

### Section 7

Effective for the period December 1, 2003 to November 30, 2007, and subject to the Union's right to allocate/reallocate future increases as provided in Article VII, the Employer shall pay monthly to the authorized agent of the New York State Laborers Employers Cooperation and Education Trust Fund the hourly rate specified in Schedule A for all hours worked by employees represented by the Mason Tenders . It is the intention of the parties that no contributions shall be required on the premium portion of wages, i.e., contributions shall be based upon hours worked and not upon wages paid.

### Section 8.

Effective for the period December 1, 2003 to November 30, 2007, and subject to the Union's right to allocate/reallocate future increases as provided in Article VII, the Employer shall pay monthly to the authorized agent of the New York State Health and Safety Trust the hourly rate specified in Schedule A for all hours worked by employees represented by the Mason Tenders. It is the intention of the parties that no contributions shall be required on the premium portion of wages, i.e., contributions shall be based upon hours worked and not upon wages paid.

### Section 9.

The Employer agrees to deduct and transmit to the Mason Tenders District Council Political Action Committee ("MTDC PAC") $0.05 for each hour worked, or such other amount as the Mason Tenders may subsequently designate, from the wages of those employees represented by the Mason Tenders who have voluntarily authorized such contributions on the forms provided for that purpose by the Union. All transmittals shall be accompanied by a list of the names of those employees for whom such deductions have been made, and the amount deducted for each such employee.

### Section 10.

The Employer shall contribute $0.10 for each hour worked to the Environmental Remediation Industry Promotion Fund (the "Promotion Fund"). The Unions further agree to require the same contribution to be made under independent collective bargaining agreements entered into by the Unions covering all or part of the jurisdiction of work set froth in Article IV below, (excluding the Mason Tenders Independent Agreement covering, among other things, general laborers' jurisdiction). The Union shall have no responsibility or obligation with respect to the collection of such contributions. If the Employer utilizes the services of the Fringe Benefit Funds referred to in Article VIII, Section 11 to collect such contributions, the Funds may assess an administrative fee for such services. The moneys shall be expended in accordance with the terms of the Trust Indenture that formed the Promotion Fund but shall not be utilized to fund any adversarial action against the Unions or any of their constituent locals.

### Section 11.

(a)     Every Employer that becomes an Association member after May 31, 2000, shall post and maintain a bond in the amount of fifty thousand dollars ($50,000), to ensure payment of contributions to the Fringe Benefit Funds set forth in this Article of the Agreement (the "Fringe Benefit Funds") and remittance of dues check-offs to the Unions, and employee contributions to the MTDC PAC. In the alternative, such Employers may place a certificate of deposit, in the amount of the applicable bond, in an account controlled by the Trustees, to ensure payment of

- 14 -

contributions to the Fringe Benefit Funds and remittance of dues check-offs to the Unions and authorized contributions to the MTDC PAC, provided the interest from such certificate of deposit shall belong to the Employer. The Employer agrees to execute all forms required by the Fringe Benefit Funds or the Union in connection with the posting of a certificate of deposit in the place of a bond. An Employer may further be admitted as a member of the Association after May 31, 2000 by posting and maintaining a bond or certificate of deposit of at least $10,000, provided that the principal of the Company executes a verification in form attached hereto as Schedule C accepting personal liability for contributions owed to the Fringe Benefit Funds set forth in this Article of the Agreement up to the difference between the bond and/or certificate of deposit maintained by the Employer and $50,000.

(b)     No bond or certificate of deposit posted or provided pursuant to subparagraph a of this Section 11 shall be subject to forfeiture unless: (l) (A) the Employer admits in writing signed by an officer of the Employer, or a Court determines, that the Employer owes payments of contributions to the Fringe Benefit Funds, or remittance of dues or MTDC PAC check-offs to the Union, or (B) there is a deficiency and the Fringe Benefit Funds or the Union receives notice of expiration or termination of the bond; and (2) the Employer (A) fails to pay said monies within 10 days of said writing or judicial determination, or (B) fails to provide a substitute bond at least 5 days prior to the expiration of termination of said bond.

(c)     In the event a deficiency has been determined by an audit of the Employer's books and records and said audit is certified by the Fringe Benefit Funds' auditors, the Employer shall have 30 days to obtain a certified audit from an independent auditor. If this certified audit determines that there is no deficiency, then the Employer shall not be required to post any bond pursuant to this subparagraph (c) of this Section 11. If the Employer does not obtain a certified audit from an independent auditor determining that there is no deficiency, or if the certified audit determines that there is a deficiency in an amount lower than the amount certified by the Funds' auditors and the lower certified deficiency remains unpaid for 60 days after presentment of the Fringe Benefit Funds' certified audit to the Employer, the Union may require the Employer to post and maintain a bond, within 60 days of receiving notice from the Union of the requirement to post and maintain such a bond, provided that such bond shall not exceed the following amounts: for an Employer's first violation, the amount of the bond shall not exceed the audited amount or the amount of the lower certified deficiency, whichever is less; and for an Employer's second violation, the amount of the bond shall not exceed twice the audited amount or twice the amount of the lower certified deficiency, whichever is less.

(d)     In the event the Trustees receive payment either on a bond or through forfeiture of a certificate of deposit under this Section 11 and said payment is insufficient to satisfy the entire deficiency in the payment of contributions to the Fringe Benefit Funds and in remittance of dues check-offs to the Union, then the Trustees shall make a *pro rata* payment to each of the Fringe Benefit Funds and to the Union in an amount equivalent to the percentage of the total deficiency received by the Trustees through forfeiture of the bond or the certificate of deposit.

## Section 12

(a)     The books and records of the Employer shall be made available at all reasonable times for inspection and audit by the accountants or other representatives of the Fringe Benefit Funds set forth in this Article of the Agreement, including, without limitation, all payroll sheets, W-2 forms, New York State Employment Reports, Insurance Company Reports and supporting

checks, ledgers, general ledger, cash disbursement ledger, vouchers, 1099 forms, evidence of unemployment insurance contributions, payroll tax deductions, disability insurance premiums, certification of workers' compensation coverage, and any other items concerning payroll(s), provided, however, that, except based on a showing of non-cooperation or other bad faith acts or omissions by the Employer, the Trustees shall not direct, and Employers shall not be required to submit to, an audit for any period of time that has been the subject of a previous audit; nor, absent a showing of non-cooperation or other bad faith acts or omissions by the Employer, shall it direct, nor shall Employers be required to submit to, an audit covering periods dating back more than three years from the date the audit is first requested. In addition, the aforementioned books and records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the Employer shall also be made available at all reasonable times for inspection and audit by the accountants of the Fringe Benefit Funds set forth in this Article of the Agreement. The Employer shall retain, for a minimum period of six years or such time as required by law, whichever is less, payroll and related records necessary for the conduct of a proper audit in order that a duly designated representative of the Trustees may make periodic review to confirm that contributions owed pursuant to this Agreement are paid in full.

(b)     In the event, after the Trustees have made a reasonable request and provided proper and timely notice to the Employer, the Employer fails to produce its books and records necessary for a proper audit, the Trustees, in their sole discretion, may determine that the Employer's monthly hours subject to contributions for each month of the requested audit period are the highest number of employee hours for any month during the twelve months' audited, or during the last twelve months for which reports were filed, whichever monthly number of hours is greater. Such determination by the Trustees shall constitute presumptive evidence of delinquency. Prior to making such determination, the Trustees shall mail a final seven day written notice to the Employer advising him that such determination shall be made if the Employer does not schedule a prompt audit. Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records for audit.

(c)     If after an audit of its books and records, the Employer is found to be substantially delinquent, as defined herein, in the payment of fringe benefit contributions to the Fringe Benefit Funds, the Employer shall bear the imputed cost of the audit, as set forth below, or the actual cost of the audit, whichever is less. The "imputed cost of the audit" is equal to

$$\frac{\text{total audited deficiency x number of months audited}}{150}$$

"Substantially delinquent" is defined as any deficiency in the payment of fringe benefit contributions to the Fringe Benefit Funds in excess of 10% of the fringe benefit contributions paid to the Fringe Benefit Funds during the period that is the subject of the audit. In the event the Fringe Benefit Funds bring and prevail in an action to recover the actual or imputed costs of audit, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

(d)     Employers shall be entitled to not less than thirty (30) days' advance written notice of any audit to be conducted under this Article VIII. The Employer shall be able to adjourn the audit by up to five (5) business days, provided it provides the applicable Trust Fund with no less than ten (10) calendar days' advance written notice of its need for an adjournment. If, however, exigent circumstances exist for conducting the audit on less notice, the Trust Fund

may do so, provided it gives advance written notice of the audit, which notice shall be reasonable given the circumstances. The penalty provisions of subparagraph (e) of this Section 12 shall not apply if less than thirty (30) days notice is given.

(e).    In the event that, after the Fringe Benefit Funds have provided proper and timely notice to the Employer in accordance with subparagraph (d) above, the Employer fails to produce the books and records necessary for an audit as set forth in subsection 12(a) of this Article of the Agreement, the Employer agrees to pay a penalty of $400.00. In the event the Fringe Benefit Funds bring and prevail in an action to obtain an audit of said Employer's books and records, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

(f)    If, after an audit of its books and records, the Employer is found to be delinquent in the payment of fringe benefit contributions to the Fringe Benefit Funds, then the Employer shall pay, in addition to the delinquent fringe benefit contributions, interest on the unpaid amounts from the date due until the date of payment at the rate prescribed under section 6621 of Title 26 of the United States Code. In the event the Fringe Benefit Funds bring and prevail in an action to recover the interest on delinquent fringe benefit contributions, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

(g)    If any dispute or disagreement arises concerning the alleged failure of an Employer to make payments to the Funds of principle, interest, liquidated damages, auditors fees, attorneys fees, or any other amounts which an Employer allegedly owes to the Funds, or concerning any allegedly mistaken contribution by an Employer to the Fund, the Union or the Employer may seek arbitration of the dispute pursuant to the grievance arbitration procedures set out in Article XII. Unless a waiver is mutually agreed to in writing by the parties, a hearing shall be convened as soon as possible and the arbitrator shall submit his/her award within 20 days after the close of the hearing. The arbitrator shall have full authority to decide any and all issues raised by the submission and to fashion an appropriate remedy, including all assessments, interests, penalties and fees that could be awarded by a court of competent jurisdiction in an action brought before it under the Employee Retirement Income Security Act ("ERISA"). The arbitrator's award shall be final and binding upon the parties, and the individual Employer, and shall be enforceable in any court of competent jurisdiction. The cost of the arbitration, including the arbitrator's fees, shall be included in the award and shall be borne by the losing party. The preceding notwithstanding, the arbitrator's award shall not be binding upon the Fund's absent the Fund's written agreement to participate in this arbitration process and bound to the arbitrator's award. The agreement of the parties to submit the above-referenced matters to an arbitrator does not protect the Employer against any statutory, civil or criminal liability which may attach to its actions under New York or federal law, nor preclude the Funds from pursuing any remedy in any appropriate forum permitted by ERISA.

(h)    In the event that formal proceedings are instituted before a court of competent jurisdiction by the Trustees of the Fringe Benefit Funds to collect delinquent contributions to such Fund, and if such court renders a judgment in favor of such Fund, the Employer shall pay to such Fund, in accordance with the judgment of the court, and in lieu of any other liquidated damages, costs, attorneys' fees and/or interest, the following:

(1)    the unpaid contributions.

- 17 -

(2)        interest on unpaid contributions determined by using the rate prescribed under section 6621 of Title 26 of the United States Code.

(3)        an amount equal to the aforesaid interest on the unpaid contributions as and for liquidated damages.

(4)        reasonable attorneys' fees and costs of the action.

(5)        such other legal or equitable relief as the court deems appropriate.

(i)      The Employer hereby agrees that in the event any payment to the Union or to the Fringe Benefit Funds by check or other negotiable instrument results in the check or negotiable instrument being returned without payment after being duly presented, the Employer shall be liable for additional damages in the amount of $250.00 to cover such additional costs, charges and expenses. Nothing herein is intended, nor shall be interpreted, to mean that the Fringe Benefit Funds or Union waive any other liquidated damages.

(j)      The Employer agrees to and shall be bound by all terms and conditions of the Trust Agreement creating the Fringe Benefit Funds and by any rules, regulations, By-laws or plan documents adopted by the Trustees of the Funds to regulate said Funds, as they may be amended from time to time, except to the extent any Funds' document contradicts the terms of this Agreement.

### Section 13.

The Employer's payments under this Article VIII shall be made monthly and shall be payable on or before the fifteenth (15th) day of each month covering the payroll periods ending during the preceding calendar month.

### Section 14.

Notwithstanding any other provision of this Article, the claims and rights of all employees working under this Agreement to workers' compensation benefits pursuant to New York law shall be governed by any Workers' Compensation Addendum to this Agreement that the parties may establish.

### Section 15

The Local 12A Funds shall institute an "electronic receipt" system for the reporting of fringe benefit contributions and Union dues; and shall permit such contributions and dues to be paid to all Fringe Benefit Funds and to the Union by one check.

### Section 16

The Mason Tenders shall use its best efforts to ensure that a representative designated by the Association is appointed to serve as a Trustee on the Mason Tenders Welfare, Annuity and Pension Fund. In the event that an Association-designated representative has not been appointed as a trustee to the Mason Tenders Welfare, Annuity and Pension Fund by February 29, 2004, the Association may elect to terminate the Agreement and reopen negotiations with the Unions over the terms and conditions of employment to govern the remaining period of this Agreement. Such termination shall be effective sixty days from receipt by the Mason Tenders of notice forwarded

by certified mail return receipt requested, stating the Association's intent to reopen negotiations pursuant to this provision.

**ARTICLE IX.**                    **WORKING CONDITIONS**

### Section 1

(a)     The Employers recognize their responsibilities to provide a safe and healthful working environment for employees.  The Unions and the employees also recognize their responsibilities to cooperate with the Employers in maintaining and improving a safe and healthful working environment.  The parties agree to use their best efforts jointly to achieve these objectives.  It is understood that reasonable safety rules of an Employer not inconsistent with federal, state or municipal laws shall be complied with by all employees.

(b)     Each Employer will enforce all rules and regulations relating to safety issues that are adopted, promulgated or issued by the Occupational Safety and Health Administration, the New York Department of Environmental Conservation, or any other federal, state or municipal body having jurisdiction over the work performed by the Employer and their employees.

(c)     Any refusal or failure by an employee to obey any such health and safety rules and regulations shall result in discipline, up to and including discharge.

### Section 2

The Employers shall supply each employee with proper safety and disposable clothing, and filters for respirators. The Employers shall provide all Handlers with a respirator when the job to which a Handler has been referred requires use of a respirator. Upon request, Handlers shall acknowledge receipt of a respirator by signing a receipt containing the serial number of the respirator.

### Section 3

Masks and all other equipment used in the removal of asbestos, lead and other toxic and hazardous materials must meet the requirements of the regulations governing the industry.

### Section 4

The Employer shall supply all tools on the job required in performing the work covered by this Agreement.

### Section 5

The Employers will provide shower facilities with hot water.

### Section 6

The Employers and all employees working under this Agreement shall possess the requisite licenses and certifications for the particular type of work they are performing and toxic material they are handling.

### Section 7

- 19 -

A Hazardous Communication Program (HCP) will be developed that adopts the OSHA Standards regarding hazardous materials in the workplace and the employees' right to know the contents and safe handling procedures of such materials.   (OSHA Hazard Communication Standard 29 C.F.R. §1910.1200).

### Section 8

Before entering the employ of an Employer, each employee must pass a physical examination by a physician designated by the Union and approved by the Association.   Each Handler is required to be and to remain physically fit to perform his/her job satisfactorily, and will be required to submit to a physical examination by a physician designated by the Employer at such time or times as the Employer may determine.   The Employer shall pay for any physical required by it that is not required by law.   All physical examinations referred to in this Agreement shall be job-related, and tests administered in such examinations shall be in accordance with applicable federal, state and local law.

### Section 9

Employees shall immediately notify their supervisor when injured on the job.

### Section 10.

Employees on the job shall wear, in plain sight, numbered badges when requested to do so by the Employer; such badges shall be furnished without charge by the Employer.

### Section 11.

In buildings thirteen stories in height or over, in the event there is elevator service available, an elevator shall be provided to carry employees to and from their work during regular hours of employment.   Consideration shall be given to employees working on higher stories if elevator service is not maintained, and a reasonable time shall be allowed to and from work.

## ARTICLE X.                    SHOP STEWARDS AND FOREMEN

### Section 1

(a)      Where employees are employed on a job, the Union with jurisdiction over 80% of the work shall designate one working Handler as a Shop Steward for each shift who shall be the second person on the job (after the Foreman), and the Union with jurisdiction over 20% of the work shall designate one working Handler as a Shop Steward for each shift, but shall not have the right to send a Shop Steward from its hiring hall.   Both Unions shall notify the Employer in writing of the identity of the designated Shop Steward prior to that person's assumption of the duties as Shop Steward.   He is to work as a Handler and shall not use his position as Shop Steward to avoid performance of his duties as a working Handler.   Such designated Shop Stewards shall not exercise any supervisory functions.   There will be no non-working Shop Stewards.  There shall be no more than one Shop Steward per Union for each shift, and this Shop Steward shall be designated by the Union with jurisdiction over 80% of the work on the job as determined by Section 2 of Article IV.

- 20 -

(b)    Both Shop Stewards shall perform their duties as shop stewards at the beginning and end of each shift, except in the event of an emergency that places an employee's health or safety at risk.  At both the beginning and the end of each shift, each Shop Steward shall be provided no fewer than ten (10) minutes to perform his non-emergency duties, and if more than ten employees are on the shift, shall be provided up to (5) minutes per each five Handlers on the shift, provided further that as soon as each Shop Steward has completed his duties, he shall immediately begin to perform his duties as a Handler.  In addition to his work as an employee, the Shop Steward shall have the right to receive, but not promote, complaints or grievances and to discuss and assist in the adjustment of the same with the employee's appropriate supervisor.  Each Shop Steward shall be concerned with the employees of the Shop Steward's shift and Employer covered by this Agreement and, if applicable, subcontractors, and not with the employees of any other shift or employer or with any employees not covered by this Agreement.  The Employer will not discriminate against the Shop Steward in the proper performance of his union duties, subject to the provisions of this Agreement.

(c)    When an Employer has multiple, non-contiguous work locations on the site, the Employer may elect to have the Union appoint additional working Shop Stewards to provide independent coverage of one or more such locations, or allow the existing Shop Steward reasonable time away from his work duties to service such other locations with approval from his supervisor, which approval will not be unreasonably withheld.

(d)    Shop Stewards shall not have the right to determine when overtime shall be worked or who shall work overtime.

(e)    The Employer shall not recognize any Union representative or Shop Steward of whom it has not been informed in writing.

(f)    Shop Stewards shall be governed by the same rules regulating work and access to job sites as other employees.

(g)    Shop Stewards may not stop working or leave their work areas to investigate grievances without authorization from their supervisor.  The investigation and presentation of grievances shall be transacted in as short a time as possible and shall not interfere with the operations of the Employer.

(h)    If a Shop Steward is discharged or rejected, the Shop Steward shall at once be replaced by the Union.  The termination of said Shop Steward may be grieved in accordance with the provisions of Article XII, and if the Shop Steward is found to have been improperly terminated, the Shop Steward shall be paid for all lost time at the rate of 40 hours per week and shall be reinstated.  The Shop Steward shall be the second to the last employee to be laid off.

### Section 2

The selection of Foremen and the number of Foremen required shall be the responsibility of the Employer.  Foremen shall be designated as working foremen at the discretion of the Employer.  Foremen shall take their direction from the Employer's supervisor, and employees shall take their direction from the Foremen or any authorized supervisor.  There shall be no restriction on the right of a supervisor to perform work covered by this agreement where such work is (i) of an incidental nature, (ii) necessary to the safety of the work or the employees, (iii)

performed in connection with the instruction or training of unit employees, or (iv) required due to an emergency or circumstances beyond employer's control.

### Section 3

Shop Stewards and Foremen shall not be designated, selected or required for any employee performing safety watch duty.

### Section 4

The Business Agent, Business Manager or other designated representative of the Union shall have the right to visit or go upon the Employer's jobs during working hours for the sole purpose of administering this Agreement, provided that the Union representative (i) shall have all required licenses or certificates to enter upon the job site, (ii) shall report to and advise the Employer's supervisor of his visit upon his arrival at the job site and (iii) shall not unreasonably interfere with the Employer's operations. The Employer shall not unreasonably interfere with such Union representatives in the proper performance of their duties.

## ARTICLE XI.                    STRIKES AND LOCKOUTS

### Section 1

(a)     There shall be no strikes, walkouts, picketing, work stoppages, slowdowns, boycotts or other disruptive activity of a similar nature at a job site of, or otherwise directed at, any Employer during the term of this Agreement, and there shall be no lockouts by any Employer, except:

(i)     Where the Employer, at any job site, contracts or subcontracts work covered by this Agreement to any other person, firm, partnership, corporation or joint venture that is not bound or does not become bound by an Agreement with the Union;

(ii)     If, within two (2) business days of its issuance, an Employer fails to comply with an arbitration award or court order finding, or a National Labor Relations Board complaint alleging, that the Employer is in arrears on monies payable to employees or any of the Fringe Benefit Funds as required by Article VIII of this Agreement, the Unions shall be permitted to withdraw their members from any work for and/or picket such Employer until the Employer complies with the award or order;

(iii)     If, within ten (10) business of an Employer's receipt of a certified audit determining that the Employer is substantially delinquent in its payment of wages to its employees, dues obligations to the Union, or fringe benefit contributions to the Fringe Benefit Funds as required by Article VIII of this Agreement, the Union shall be permitted to withdraw their members from any work for and/or picket such Employer until the Employer (A) pays the deficiency or (B) provides an opinion letter from its own certified public accountant that another amount or no amount is due and posts a bond in the amount of either twice the amount determined by the Employer's accountant or in the amount of the certified audit, whichever is less. "Substantially delinquent" is defined as any deficiency in the payment of wages, dues obligations or fringe benefits contributions in excess of 10% of the wages, dues obligations and/or fringe benefit contributions paid during the period that is the subject of the delinquency;

- 22 -

(iv)     If the Employer has failed to permit review of its books and records for purposes of conducting an audit as required under the Agreement, or has failed to post or maintain a bond in the amount and in the manner provided under the Agreement;

(v)     If an Employer has not paid its employees on their normal pay day the wages required by this Agreement for work they performed under this Agreement;

(vi)     If the Employer has not made any payments to the Trust Funds described in Article VIII of the Agreement for a period of ninety days or more, or has accumulated a delinquency in Trust Fund contributions, dues payments, and/or MTDC PAC payments which in total exceed $100,000, the Union shall thereafter be permitted to cause the withdrawal of Handlers employed by such Employer and/or picket such Employer until the Employer: A) pays the deficiency; or B) provides an opinion letter from its own certified public accountant that another amount or no amount is due and posts a bond in the amount of either twice the amount determined by the Employer's accountant or in the amount of the certified audit, whichever is less; provided, however, that no Handlers shall be withdrawn from the employ of any Employer or picketing commenced against the Employer pursuant to this subsection unless the District Council or the Funds provide written notification to the Employer that its Handlers will be withdrawn and state the reason for the withdrawal no less than 24 hours before any action is taken; or

(b)     (i)     It shall not be a violation of this Agreement for an employee to refuse to cross or work behind a lawful primary picket line established by another union, but it shall be a violation of this Agreement for an employee to refuse to cross or work behind any jurisdictional or recognitional picket line by another union concerning work covered by this Agreement or any picket line in violation of this Agreement.

(ii)     It shall not be a violation of this Agreement for the union to establish a lawful primary recognitional picket line concerning work within the charter of the Union but not covered by Article IV, Section 1 of this Agreement, but employees covered by this Agreement may not refuse to cross or work behind any such recognitional picket line, and the Union shall direct all employees covered by this Agreement to cross and work behind any such picket line.

(c)     The Union shall not be responsible for any unauthorized strike or its results as long as the Union complies with its obligations set forth in this Article.

(d)     The parties to this Agreement agree that no damages of any kind or nature shall be awarded or allowed against the Unions and their affiliated locals, or any officer or member thereof by reason of the withdrawal of men from a job pursuant to subparagraphs a (i), (ii), (iii), (iv), (v) or (vi) of this Section 1.

## Section 2

The Unions shall take the following steps to obtain compliance with this Article.  In the event of a strike, walkout, picketing, work stoppage, slowdown, boycott or other disruptive activity of a similar nature at a job site of, or otherwise directed at any Employer during the term of this Agreement, not authorized by subparagraphs a (i), (ii), (iii), (iv), (v) or (vi) of Section 1 of this Article, the Unions will immediately (1) order each employee to return to work or otherwise cease violating this Agreement and (2) post notices and otherwise advise the employees that the strike or stoppage is unauthorized and in violation of the Agreement.

### Section 3

The Employers shall have the right to discharge or discipline any employee who violates the provisions of this Article. Such discharge or discipline shall be subject to the grievance-arbitration procedure but limited only to the question of fact as to whether or not such employee did engage in an activity in violation of this Article. If the fact of the employee's violation is established, the penalty imposed by the Employer shall be confirmed and shall not be subject to review or modification by the arbitrator.

### Section 4

In the event of a violation of Section 1 of this Article, the Employer may bring a federal or state court action against the Union(s) for damages and/or injunctive relief.

### ARTICLE XII          DISPUTES AND GRIEVANCES

### Section 1

(a)    This Agreement is intended to provide close cooperation between management and labor, and to facilitate the completion of work pursuant to this Agreement economically, efficiently, continuously and without interruption, delays or work stoppages.

(b)    The Employers, the Unions, and employees, collectively and individually, realize the importance to all parties to maintain continuous and uninterrupted performance of the work pursuant to this Agreement, and agree to resolve disputes in accordance with the arbitration provisions set forth in this Article.

### Section 2

Any question, complaint, dispute or grievance arising out of and during the term of this Agreement involving its interpretation and application [other than trade jurisdictional disputes or alleged violations of Article XI, Section 1 (Strikes and Lockouts)], but not including disputes arising under Article VIII, shall be considered a grievance and subject to resolution under the following procedures. The Steps listed below shall be followed in sequential order:

**STEP 1.**    The Employer or his representative shall meet with the representative of the Union and attempt to adjust the grievance between them on a job-level basis as promptly as possible, but in no event later than ten (10) working days after the grievance arose or the grieving party knew or should have known of the grievance. If the parties at this step cannot resolve the grievance within said ten (10) day period, either party has a maximum of 72 hours to appeal the grievance to Step 2 by giving written notice thereof to the other party.

**STEP 2.**    Representatives of the Union and the Employer shall meet within seven (7) working days of the referral of the dispute to this Step 2 to arrive at a satisfactory settlement. If the parties fail to reach an agreement, either party has a maximum of 72 hours to provide written notification to the other party involved, the Unions, the Association and the Joint Arbitration Board that it invokes Step 3.

**STEP 3.**    Upon receipt of the requisite written notification invoking Step 3, the Joint Arbitration Board (as defined in Section 3 below) shall promptly investigate the grievance.

- 24 -

Decisions determining such grievances shall be arrived at within seven (7) days after the Joint Arbitration Board received written notice invoking Step 3, unless such time is extended in writing by the Joint Arbitration Board upon consent of both parties to the grievance. Decisions rendered by a majority of the Joint Arbitration Board shall be binding on the parties to the grievance, except that any individual Employer who is a party to the grievance may invoke Step 4.

**STEP 4.**     If a timely raised grievance is not settled through the foregoing procedure, then either party may within twenty (20) calendar days, give the other party notice of its desire to submit the grievance to Arbitration. Richard Adelman and Roger Maher shall alternate as the arbitrator in successive disputes, with Adelman serving first. The Arbitrator will follow and be bound by the Voluntary Labor Rules of the American Arbitration Association. Any arbitration notice under this Section shall be given by certified mail, return receipt requested, and shall identify the issues sought to be arbitrated and the specific Article(s) and Section(s) of the Agreement that were allegedly violated. A grievance must be submitted to arbitration in accordance with this Article, if at all, within twenty (20) calendar days after the decision in Step 3 of the grievance procedure. Any grievance not submitted to arbitration within such twenty (20) calendar day period shall be considered waived and, thereafter, no arbitrator shall have the power to rule or make any award on any such grievance.

The Arbitrator shall fix a time and a place in New York, New York, for a hearing upon reasonable notice to each party. After such hearing, the Arbitrator shall promptly render a decision which shall be final and binding upon both parties, but the Arbitrator shall have no power to render a decision that adds to, subtracts from or modifies this Agreement. The Arbitrator's decision shall be confined to the meaning of the contract provision which gave rise to the dispute. The Arbitrator cannot order pay for time not worked, except in cases of unwarranted suspensions or discharge, or as otherwise specifically provided in this Agreement.

The parties to the Arbitration shall bear equally the expenses of the Arbitrator and the rental of the place of arbitration, if applicable. All other expenses attendant to arbitration will be borne by the party incurring them, including the expenses of any witnesses called by such party. If any employee is called by an Employer to appear at any arbitration proceeding under this Agreement, he shall be reimbursed by the Employer for any time lost at his regular straight time rate of pay.

No party shall be required to arbitrate more than one issue at a single hearing.

Only the Union and the Employer may initiate, have access to, or be parties to arbitration under this Agreement.

### Section 3

The Joint Arbitration Board described above shall consist of not less than four, and not more than ten, members, and of an equal number of representatives of the Association and the Union. Written notification to the Joint Arbitration Board, invoking Step 3 of this grievance procedure or otherwise, shall be made simultaneously to the applicable Union and the Association.

### Section 4

- 25 -

Failure of the grieving party to adhere to the time limits established herein shall render the grievance null and void, and no arbitrator shall have the power to rule or make any award on any such grievance not filed within the time limits as specified in this Article, provided that this Section 4 shall not apply to grievances arising under subparagraph b of Section 1 of Article II.

**Section 5**.

An arbitrator may order an Employer to pay employees on the Union's Out-of-Work List wages and benefits which they lost as result of the Employer's violation of the Agreement, where the arbitrator finds that the Employer in question failed to notify the Union of the particular job which is the subject of the grievance with the intent to evade the provisions of the Agreement.

**Section 6**.

In the event the Union files a grievance regarding the discharge of a shop steward or the failure to employ a shop steward on a job site, such matter shall proceed immediately to arbitration to be held on an expedited basis before one of the designated contract arbitrators. The arbitration shall be heard no more than ten (10) days after the grievance is filed, and an award shall issue no fewer than three days after the hearing is commenced.

**ARTICLE XIII**          **NON-DISCRIMINATION**

**Section 1**.

The Employer and Union agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, age, marital status, physical or mental disability, veteran status, genetic predisposition or carrier status, alienage or citizenship status or sexual orientation in any manner prohibited by law or regulation. Any complaints regarding the application of this provision shall be brought to the immediate attention of the Employer for consideration and resolution.

**Section 2**

The Employer and the Union agree to cooperate in the equal non-discriminatory application of this Agreement and to cooperate in dealing with such discrimination, should it occur. The Employer and the Union agree that they will not tolerate sexual, racial or other discriminatory harassment in the workplace and agree to cooperate to maintain a workplace free from such harassment. Employees may bring complaints of a violation of this Article to either the Employer or the Union without retaliation.

**Section 3**

Masculine pronouns, i.e., he, his or him, are used throughout this document for convenience only. Where appropriate under the circumstances, they should be read as referring to either gender

**ARTICLE XIV**          **MISCELLANEOUS**

**Section 1**

- 26 -

(a)    It is agreed by and between the parties hereto that if any Federal or State court shall at any time decide that any clause or clauses of this Agreement is or are void or illegal, such decision shall not invalidate the other portions of this Agreement, but such clause shall be stricken out and the remaining portions of this Agreement (including Article XI) shall be considered binding between the parties hereto.

(b)    Any provisions of the Agreement hereinabove mentioned which provide for Union security or employment in a manner and to an extent prohibited by any law or the determination of any Governmental Board or Agency, shall be and hereby are of no force or effect during the term of any such prohibition.  It is understood and agreed, however, that if any of the provisions of the Agreement which are hereby declared to be of no force or effect because of restrictions imposed by laws is or are determined either by Act of Congress or other legislative enactment or by a decision of the Court of the highest recourse to be legal or permissible, then any such provision of said Agreement shall immediately become and remain effective during the remainder of the term of this Agreement.

## Section 2

It is the intent of the parties that the provisions of this Agreement will supersede all prior agreements and understandings, oral or written, expressed or implied, between such parties and shall govern their entire relationship and shall be the sole source of any and all rights or claims which may be asserted in arbitration hereunder or otherwise.

## Section 3

The Employers and the Unions agree that their efforts will be employed in the public interest to increase production and reduce costs by maintaining maximum man rate output, and by using all machinery, tools, appliances, methods or technologies which may be practicable.

## Section 4

The Employers and the Unions obligate themselves to live up to all the provisions of this Trade Agreement in good faith.

## Section 5

This Agreement concludes all collective bargaining between the parties hereto for the work set forth in Article IV, Section 1 of this Agreement, during the term hereof and constitutes the sole, entire and existing agreement between the parties hereto, and supersedes all prior Agreements and undertakings, oral or written, express or implied, or practices, between the Employer and the Union or its employees, and expresses all obligations and restrictions imposed on each of the respective parties during its term.

## Section 6

The failure of either party to this Agreement to require strict performance of any of its rights under, or of any of the terms or conditions contained in, this Agreement shall not be deemed a waiver, modification or abandonment of any of the rights or remedies provided herein, nor shall it be deemed a waiver, modification or abandonment of its rights to insist upon strict performance of all the terms and conditions of this Agreement thereafter.

- 27 -

### Section 7

The Association agrees that within forty-eight (48) hours after the execution of this Agreement, it will submit to the Union a schedule setting forth in full each member of the Association, giving each member's name and address and all owners and officers. When the member of the Association is doing business under a trade name, the name of the principal shall also be given. The Association further agrees that it will immediately notify the Union in writing of any change in its membership, setting forth the names and addresses of any new members of the Association, and setting forth the names and addresses of those members which may have dropped out or been suspended from the Association.

### Section 8

Employers and their principals hereby agree that in the event of their withdrawal, resignation, suspension or termination from membership in the Association, they shall, during the remaining term of this Agreement, be bound by the terms of the 2003-2007 Independent Asbestos and Hazardous Waste Removal Agreement to which the Mason Tenders is a party, including the provisions regarding personal liability. Copies of the Independent Agreement have been provided to the Association and shall be furnished by the Unions to any Employer signatory to this Agreement upon request.

### Section 9

(a)     The Union and Association shall establish a Labor-Management Committee consisting of two representatives designated by the Union and two representatives designated by the Association.    Such Committee shall meet periodically.    The purpose of the Labor-Management Committee will be to address and resolve common problems arising during the life of the Agreement regarding work covered by the Agreement.    The Labor-Management Committee will not be authorized or empowered to effectuate any action except by unanimous vote of all designated representatives, and unresolved matters shall not be subject to the grievance-arbitration provisions of this Agreement.

(b)     Union Audits. The Mason Tenders may request that the Labor-Management Committee authorize the Mason Tenders to audit all relevant books and records of any Employer that the Mason Tenders believe is failing to comply with the Agreement; the Labor-Management Committee will authorize such an audit when the Mason Tenders present persuasive evidence that the Employer it seeks to audit is not complying with the Agreement.

### Section 10

(a)     There shall be a Joint Apprenticeship Training Committee ("JATC") charged with direction of the Apprentices. The JATC shall consist of three (3) representatives of Employers in the industry and three (3) representatives of the Union, and it shall administer and supervise the apprenticeship provision of this Agreement, and be responsible for all apprentices and all conditions affecting apprentices.

(b)     The wages of Apprentices shall be based on the following percentages of the current Local 78 Journeyman scale:

       (i)              First 1000 hours of training:        78%

| (ii) | Second 1000 hours of training: | 80% |
| (iii) | Third 1000 hours of training: | 83% |
| (iv) | Fourth 1000 hours of training: | 89% |

(c)    The Employer shall contribute to the Benefit Funds at the rate set forth in Article VIII of this Agreement.

(d)    Except as specifically provided for in this Agreement, Apprentices will be subject to the provisions of the Agreement between the Union and the Employer.

(e)    The Employer agrees to and shall be bound by all terms and conditions of the JATC documents creating the JATC and by any rules or by-laws adopted by the JATC, as they may be amended from time to time.  To the extent that any JATC document contradicts the terms of this Agreement, the terms of the JATC document shall be fully incorporated herein and the JATC document shall control.

(f)    The Employer agrees to supply all Apprentices with all safety equipment including full and half-face respirators, filters for respirators, disposable clothing and any other tools which may be required to perform his or her duties.

(g)    The Employer agrees to utilize Union apprentices as specified in Schedule B.

**Section 11**

If any other labor organization claims jurisdiction over any work required by this Agreement to be performed by the Unions, the parties agree to follow and be bound by the New York Plan for the Settlement of Jurisdictional Disputes. Pending the resolution of the dispute, the Employer shall assign Handlers represented by the Unions to perform the work in question.

**ARTICLE XV**          **PERIOD OF AGREEMENT**

**Section 1**

This Agreement shall become effective and binding upon the parties hereto on the 1st day of December, 2003, and remain in effect through November 30, 2007, and shall renew from year to year thereafter unless any party hereto shall give written notice to the others of its desire to modify, amend, or terminate this Agreement on its expiration date.  Such notice must be given in writing by certified mail, postage prepaid, sixty days, but not more than ninety days, before the expiration date of this Agreement.

**Section 2**

The Unions shall have the right to terminate this Agreement should the Association merge, join, consolidate or combine with any other employer group, organization or association.

**Section 3.**

This Agreement shall be binding on the parties, regardless of any change of name by the Mason Tenders' District Council of Greater New York or changes in the composition of its constituent local unions. This Agreement shall be enforceable by the Association, the Mason Tenders' District Council of Greater New York, its successor, the Fringe Benefit Funds, and any constituent local so authorized by the Mason Tenders' District Council of Greater New York or its successor.

Signed by both parties hereto as of May, ___27___ 2004, at New York, New York, with an effective date of December 1, 2003.

**THE MASON TENDERS'**
**DISTRICT COUNCIL OF**
**GREATER NEW YORK**

BY: _____

     Anthony Silveri,

     Business Manager

**THE ENVIRONMENTAL**
**CONTRACTORS**
**ASSOCIATION, INC.**

BY: _Frank Garito/wk_____

     _Frank Garito, President_
     (Print Name and Title)

**LOCAL 12A ABATEMENT OF THE**
**INTERNATIONAL ASSOCIATON OF**
**HEAT AND FROST INSULATORS**
**AND ASBESTOS WORKERS**

BY:_____

   _____

   (Print Name and Title)

SCHEDULE A

To the 2003 – 2007 Trade Agreement
Between the Mason Tenders' District Council of Greater New York and
Local 12A Abatement Of the International Association of Heat and Frost Insulators
and Asbestos Workers, and the Environmental Contractors Association, Inc.

1.    Wages

(a)    Effective December 1, 2003, wages for Handlers represented by the Mason Tenders shall be $25.50/hr; in addition to December 1, 2003 Fringe Benefit Fund increases specified below, and subject to the Union's right to allocate and/or reallocate set forth in Article VII of the Agreement, wages shall increase by an additional $1.50/hr effective December 1, 2004; by an additional $1.50/hr effective December 1, 2005; and by an additional $1.50/hr effective December 1, 2006. These increments shall be allocated by the Union to either wages or to MTDC Fringe Benefit Funds prior to December 1 of each contract year.

(b)    Effective December 1, 2003, wages for Handlers represented by the Asbestos Workers shall be $24.45/hour; in addition to the December 1, 2003 Fringe Benefit Fund increases specified below, and subject to the Union's right to allocate and/or reallocate set forth in Article VII of the Agreement, wages shall increase to $24.45/hr effective December 1, 2004; by an additional $1.00/hr effective December 1, 2005; and by an additional $1.00/hr effective December 1, 2006. These increments shall be allocated by the Union to either wages or to Local 12A Fringe Benefit Funds prior to December 1 of each contract year.

2.    Fringe Benefit Fund Contributions

(a)    For the period December 1, 2003, through November 30, 2007, subject to the Unions' right of allocation and reallocation set forth in Article VII of the Agreement, dues check off and Fringe Benefit Fund contributions to the Mason Tender Fringe Benefit Funds shall be made for Handlers represented by the Mason Tenders, as follows:

1.    Pension Fund: $1.06/hr

2.    Welfare Fund: $3.50/hr

3.    Annuity Fund: $2.00/hr

4.    Training Fund: $0.25/hr

5.    GNY LECET Fund: $0.04/hr

6.    New York State Health and Safety Trust Fund: $0.05/hr

7.    New York State Laborers Employers Cooperation and Education Trust Fund: $0.05/hr

8.    Dues Checkoff: $1.35/hr

9.    MTDC PAC: $.05

(b)     Effective December 1, 2003, and subject to the Unions' right of allocation and reallocation set forth in Article VII of the Trade Agreement, dues check off and Fringe Benefit contributions to the Local 12A Fringe Benefit Funds shall be made for Handlers represented by the Asbestos Workers, as follows:

For Classification A workers:

| | | |
|---|---|---|
| 1. | Welfare | $1.50/hr |
| 2. | Annuity | $5.00/hr |
| 3. | Education | $0.50/hr |
| 4. | Dues Checkoff | $1.25/hr |

For Classification B workers:

| | | |
|---|---|---|
| 1. | Welfare | $3.00/hr |
| 2. | Annuity | $3.50/hr |
| 3. | Education | $0.50/hr |
| 4. | Dues Checkoff | $1.60/hr |

## SCHEDULE B

### To the 2003 – 2007 Trade Agreement
### Between the Mason Tenders' District Council of Greater New York and
### Local 12A Abatement Of the International Association of Heat and Frost Insulators
### and Asbestos Workers, and the Environmental Contractors Association, Inc.

1.      **Hiring Hall ratio where Mason Tenders provide 80% of the Handlers**

(a)      The following is the order for hiring Handlers on a job site where the Mason Tenders provide 80% of the Handlers as outlined in Article IV, Section 2(a).  As set forth below, "C" denotes a Handler provided from the Local 78 out of work list pursuant to the generally applicable procedures set forth in Article III, Section 3(f) of the Agreement (*i.e.* he/she may be selected by name from the Local 78 out of work list); "Shop Steward" denotes a Handler referred by Local 12A and appointed to perform the functions of the shop steward as set forth in the Agreement; 12A" denotes a Handler provided from the Local 12A out of work list pursuant to the generally applicable procedures set forth in Article III, Section 3(f) of the Agreement (*i.e.* he/she may be selected by name from the Local 12A out of work list); "78" denotes a Handler referred from the Local 78 Out of Work list pursuant to the Local 78 Hiring Hall rules; and "A" denotes an apprentice referred from the Local 78 Hiring Hall and selected pursuant to the Local 78 Hiring Hall rules.

| 1 | C | 21 | 78 |
|---|---|----|----|
| 2 | Shop Steward | 22 | C |
| 3 | C | 23 | C |
| 4 | 12A | 24 | A |
| 5 | C (with option for an Apprentice) | 25 | 12A |
| 6 | C | 26 | 78 |
| 7 | C | 27 | C |
| 8 | C | 28 | C |
| 9 | 12A | 29 | A |
| 10 | C | 30 | 12A |
| 11 | 78 | 31 | 78 |
| 12 | C | 32 | C |
| 13 | C | 33 | C |
| 14 | A | 34 | A |
| 15 | 12A | 35 | 12A |
| 16 | 78 | 36 | 78 |
| 17 | C | 37 | C |
| 18 | C | 38 | C |
| 19 | A | 39 | A |
| 20 | 12A | 40 | 12A |

(b)      After the 20th Handler, every subsequent ten workers continues to follow the same pattern as 11-20.  The sequence does not at any time go back to the 1-10 ordering.

- 33 -

2.    **Hiring Hall ratio where Asbestos Workers provide 80% of the Handlers**

(a)    The following is the order for hiring Handlers on a job site where the Asbestos Workers provide 80% of the Handlers as outlined in Article IV, Section 2(a). As set forth below, "C" denotes a Handler provided from the Local 12A out of work list pursuant to the generally applicable procedures set forth in Article III, Section 3(f) of the Agreement (*i.e.* he/she may be selected by name from the Local 12A out of work list); "Shop Steward" denotes a Handler selected and appointed by the Asbestos Workers; "78" denotes a Handler provided from the Local 78 out of work list pursuant to the generally applicable procedures set forth in Article III, Section 3(f) of the Agreement (*i.e.* he/she may be selected by name from the Local 78 out of work list); and "A" denotes an apprentice referred from Local 12A, provided Local 12 A maintains a registered apprenticeship program.

| | | | |
|---|---|---|---|
| 1 | C | 21 | C |
| 2 | Shop Steward | 22 | C |
| 3 | C | 23 | C |
| 4 | 78 | 24 | A |
| 5 | C (with option for an Apprentice) | 25 | 78 |
| 6 | C | 26 | C |
| 7 | C | 27 | C |
| 8 | C | 28 | C |
| 9 | 78 | 29 | A |
| 10 | C | 30 | 78 |
| 11 | C | 31 | C |
| 12 | C | 32 | C |
| 13 | C | 33 | C |
| 14 | A | 34 | A |
| 15 | 78 | 35 | 78 |
| 16 | C | 36 | C |
| 17 | C | 37 | C |
| 18 | C | 38 | C |
| 19 | A | 39 | A |
| 20 | 78 | 40 | 78 |

(b)    After the 20th Handler, every subsequent ten workers continues to follow the same pattern as 11-20. The sequence does not at any time go back to the 1-10 ordering.